UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    :      **SUPERSEDING INDICTMENT**

   - against -                                  :

                         S1 05 Cr. 888 (LAK)

JEFFREY STEIN,                              :
JOHN LANNING,
RICHARD SMITH,                              :
JEFFREY EISCHEID,
PHILIP WIESNER,                             :
JOHN LARSON,
ROBERT PFAFF,                               :
DAVID AMIR MAKOV,
LARRY DELAP,                                :
STEVEN GREMMINGER,
RAYMOND J. RUBLE,                           :
    also known as "R.J. Ruble,"
GREGG RITCHIE,                              :
RANDY BICKHAM,
MARK WATSON,                                :
CAROL WARLEY,
DAVID RIVKIN,                               :
CARL HASTING,
RICHARD ROSENTHAL, and                      :
DAVID GREENBERG,
                                            :
                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: OCT 1 7 2005

## COUNT ONE
### (Conspiracy)

The Grand Jury charges:

### Background

1

<u>Pertinent Entities</u>

       1.     At all times relevant to this Indictment, KPMG LLP ("KPMG"), a

co-conspirator not named as a defendant herein, was a limited liability partnership

headquartered in New York, New York, and with more than 90 offices nationwide.

KPMG LLP is and was a member firm of KPMG International, a Swiss cooperative of

which all KPMG firms worldwide are members.  At all times relevant to this Indictment,

KPMG was one of the largest auditing firms in the world, providing audit services to

many of the largest corporations in the United States and elsewhere.  Sixteen of the

defendants are former KPMG partners, and one defendant is a former KPMG senior

manager.

       2.     In addition, KPMG was in the business of providing tax services to

corporate and individual clients, including some of the wealthiest individuals in the

United States.  These tax services included, but were not limited to, preparing tax returns,

providing tax planning and tax advice, and representing clients in Internal Revenue

Service ("IRS") audits and Tax Court litigation with the IRS.  The portion of KPMG's

tax practice that specialized in providing tax advice to individuals, including wealthy

individuals, was known as Personal Financial Planning, or "PFP."  The KPMG group

focused on designing, marketing, and implementing tax shelters for individual clients

was known at different times as CaTS ("Capital Transaction Strategies"), and IS

("Innovative Strategies").  The KPMG group focused on designing, marketing, and

2

implementing tax shelters for corporate clients was known as Stratecon.  KPMG also had

a department within the tax practice known as Washington National Tax, which was

designed to provide expert tax advice to KPMG professionals in the field, and which

participated in designing tax shelters and drafting opinion letters relating to those

shelters.

        3.     At all times relevant to this Indictment, "Bank A" was a foreign

bank with its principal United States branch located in New York, New York, and an

audit client of KPMG.   As described below, Bank A participated in FLIP, OPIS, BLIPS,

and SOS tax shelter transactions

        4.     At all times relevant to this Indictment, "Bank B" was a foreign

bank with its principal United States branch located in New York, New York and an

audit client of KPMG.  As described below, Bank B participated in BLIPS tax shelter

transactions.

        5.     At all times relevant to this Indictment, "Bank C" was a foreign

bank and an audit client of KPMG.  As described below, Bank C participated in BLIPS

tax shelter transactions.

        6.     At all times relevant to this Indictment, "Bank D" was a foreign

bank with its principal United States branch located in New York, New York.  As

described below, Bank D participated in FLIP and OPIS tax shelter transactions.

        7.     At all times relevant to this Indictment, "Bank E" was a foreign

bank with its principal United States branch located in New York, New York.  As
described below, Bank E participated in a set of BLIPS tax shelter transaction.

The Defendants

8.     Defendant JEFFREY STEIN, a lawyer with a Master's in tax law,
was a tax partner at KPMG from at least in or about 1987 through in or about January
2004.  In or about 1996, STEIN became the Partner-in-Charge of KPMG's international
tax group; in or about March 1998, STEIN became Vice Chairman - Tax Operations; in
or about 2000, STEIN became Vice Chairman of Tax Services; and in or about April
2002, STEIN became Deputy Chairman of KPMG.

9.     Defendant JOHN LANNING, a certified public accountant
("CPA"), was a tax partner at KPMG from at least in or about 1982 through in or about
2000.  In or about October 1996, LANNING became Vice Chairman -Tax Operations,
and in or about March 1998, LANNING became Vice Chairman of Tax Services.

10.    Defendant RICHARD SMITH, a lawyer, was a tax partner at
KPMG from at least in or about 1995 through in or about 2004.  He worked in
Washington National Tax, became a leader of Washington National Tax, became Area
Managing Partner for the Western Region of KPMG's tax practice in January 2002, and
then in May 2002 became a Vice Chairman of KPMG in charge of tax.

11.    Defendant JEFFREY EISCHEID, a CPA, was a tax partner in
KPMG's Atlanta office from at least 1997 through in or about 2004.  During that period

4

of time, he served as head of KPMG's Innovative Strategies group and Partner-in-Charge of KPMG's Personal Financial Planning group.

        12.    Defendant PHILIP WIESNER, a lawyer with a Master's in tax law and a CPA, was a tax partner at KPMG from at least in or about 1984 through in or about June 2004, and served as Partner-in-Charge of Washington National Tax during 1998 and a portion of 1999.

        13.    Defendant JOHN LARSON, a lawyer and a CPA, was a KPMG senior tax manager based in KPMG's San Francisco, California, office prior to 1997, and defendant ROBERT PFAFF, a lawyer and a CPA, was a KPMG tax partner based in KPMG's Denver, Colorado, office prior to 1997. In or about 1997, LARSON and PFAFF resigned their positions at KPMG and formed a limited liability company with its principal office located in San Francisco and a satellite office located in Denver. In or about 1999, LARSON, PFAFF, and the defendant DAVID AMIR MAKOV formed another limited liability company with its principal office located in San Francisco and a satellite office located in Denver. As detailed more fully below, LARSON, PFAFF, MAKOV and others, used the two limited liability companies described in this paragraph, and certain related entities (collectively referred to herein as the "Larson/Pfaff Entities") to participate in certain tax shelter transactions as, among other things, the purported investment advisor.

        14.    Defendant LARRY DELAP, a CPA, was a KPMG tax partner from

at least in or about 1974 through in or about September 2002.  DELAP was the Partner-in-Charge of KPMG's Department of Professional Practice - Tax from the creation of that position by the defendant JOHN LANNING in or about 1997 through in or about September 2002.

15.     Defendant STEVEN GREMMINGER, a lawyer, was a partner at KPMG and an associate general counsel in KPMG's Office of General Counsel from at least in or about 1998 through in or about 2005.  GREMMINGER was the primary Office of General Counsel contact for KPMG's tax practice.

16.     Defendant RAYMOND J. RUBLE, also known as "R.J. Ruble," a lawyer, was a tax partner in the New York, New York office of a prominent national law firm (the "RUBLE Law Firm").

17.     Defendant GREGG RITCHIE, a CPA, was a KPMG tax partner from at least in or about 1987 through in or about September 1998.  During his time at KPMG, RITCHIE was head of KPMG's CaTs group.  In or about September 1998, RITCHIE left KPMG to work as chief financial officer of a company controlled by a businessman from Beverly Hills, California (the "Beverly Hills Businessman"), a KPMG client.  RITCHIE worked in this capacity for the Beverly Hills Businessman's company through the date of this Indictment.  While working for the Beverly Hills Businessman, RITCHIE acted as the liaison between the Beverly Hills Businessman and KPMG with respect to BLIPS and other tax shelter transactions.

18.     Defendant RANDY BICKHAM, a CPA, was senior manager in KPMG's tax practice prior to July 2000, and from in or about July 2000 through in or about April 2002, was a KPMG tax partner.  BICKHAM was a member of the Innovative Strategies group, and worked in KPMG's San Francisco, CA office.

19.     Defendant MARK WATSON, a CPA, was a KPMG tax partner and the Partner-in-Charge of the PFP division of Washington National Tax from at least June 1998 through July 2000.  In or about August 2000, WATSON was transferred to a KPMG affiliate partnership located in Amsterdam.

20.     Defendant CAROL WARLEY, a CPA, was a KPMG tax partner from in or about 1993 through in or about December 2004.  WARLEY worked in KPMG's Houston, TX office, and was a member of the Innovative Strategies group.

21.     Defendant DAVID RIVKIN, a CPA, was a KPMG tax partner from in or about July 1999 through in or about April 2004.  RIVKIN worked in KPMG's San Diego, CA office, and was a member of the Innovative Strategies group.

22.     Defendant CARL HASTING, a lawyer and a CPA, was a KPMG tax partner from in or about July 1998 through in or about November 2003.  HASTING worked in KPMG's Woodland Hills, CA office and was a member of the Innovative Strategies group.

23.     Defendant RICHARD ROSENTHAL, a CPA, was a KPMG tax partner from at least in or about 1987 through in or about 2004.  From in or about 1998

through in or about July 2000, ROSENTHAL was Area Managing Partner of KPMG's

western region, from in or about July 2000 through in or about May 2002,

ROSENTHAL was Vice Chairman - Tax Operations, and from in or about October 2002

through in or about 2004 ROSENTHAL was Chief Financial Officer of KPMG.

24.    Defendant DAVID GREENBERG, a CPA, was hired by KPMG as

a direct entry tax partner in or about May 1999.  GREENBERG was a KPMG tax partner

from in or about May 1999 through in or about August 2003.  GREENBERG was a

member of the Stratecon group and worked in KPMG's Los Angeles, CA office.

### Tax Shelter Fraud

25.    During the period from at least in or about 1996 through at least in

or about 2005, the defendants JEFFREY STEIN, JOHN LANNING, RICHARD

SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT

PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER,

RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY

BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL

HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG, and others known

and unknown to the Grand Jury (hereinafter their "co-conspirators") participated in a

scheme to defraud the IRS by devising, marketing, and implementing fraudulent tax

shelters, by preparing and causing to be prepared, and filing and causing to be filed with

the IRS false and fraudulent U.S. individual income tax returns containing the fraudulent

8

tax shelter losses, and by fraudulently concealing from the IRS those shelters.

26.    The conspirators designed and marketed these shelters as a means for wealthy individuals with taxable income or gains generally in excess of $10 million in 1997 and of $20 million in 1998-2000 fraudulently to eliminate or reduce their individual income taxes to the IRS on that income or gains.  As marketed and implemented, instead of the wealthy clients paying U.S. individual income taxes that were legally owed, generally 20% to 35% of their income or gains, the client could choose the amount of tax loss desired, and pay certain of the conspirators and others an all-in cost generally equal to approximately 5 to 7% of the desired tax loss.  This "all-in" cost included the fees of KPMG, the Larson/Pfaff Entities, the various law firms that supplied opinion letters, including RUBLE and the RUBLE Law Firm, the bank participants, and others, as well as a small portion that would be used to execute purported "investments" that were designed to conceal the tax shelters.  The size of the purported "investments," the timing of the transactions, and the amount of the fees to certain conspirators and participants were all determined based on the tax loss to be generated.

27.    In order to conceal the true nature of the tax shelter from the IRS, to attempt to evade the wealthy clients' U.S. individual income taxes, and to shield the clients from IRS penalties for underpayment of  income taxes, KPMG and/or a law firm provided the clients with opinion letters containing false and fraudulent representations

and statements and claiming that the tax shelter losses were "more likely than not" to survive IRS challenge.  The law in effect from at least in or about August 1997 provided that if a taxpayer claimed a tax benefit that was later disallowed, the IRS could impose substantial penalties, ranging from 20%-40% of the underpayment of tax attributable to the shelter, unless the tax benefit was supported by an independent opinion relied on by the taxpayer in good faith that the tax benefit was "more likely than not" to survive IRS challenge.  Thus, the conspirators issued false and fraudulent opinion letters with the intent that the clients would claim the fraudulent tax shelter losses on tax returns and provide the opinion letter and other false and fraudulent transactional documents and/or the false and fraudulent representations and statements contained therein to the IRS if and when the client was audited.

28.     Among the fraudulent tax shelter transactions designed, marketed, and implemented by the defendants JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG and their co-conspirators were FLIP ("Foreign Leveraged Investment Program"), OPIS ("Offshore Portfolio Investment Strategy"), BLIPS ("Bond Linked Issue Premium Structure"), SOS

("Short Option Strategy") and their variants.

29.    FLIP was marketed and sold from at least in or about 1996 through at least in or about 1999 to at least 80 wealthy individuals and generated at least $1.9 billion in phony tax losses; KPMG's gross fees from FLIP transactions were at least $17 million; the RUBLE Law Firm's gross fees from FLIP transactions were at least $3 million; the Larson/Pfaff Entities' gross fees from FLIP transactions were at least $3 million.

30.    OPIS was marketed and sold from at least in or about 1998 through at least in or about 1999 to at least 170 wealthy individuals, and generated at least $2.3 billion in phony tax losses; KPMG's gross fees from OPIS transactions were at least $28 million; the RUBLE Law Firm's gross fees from OPIS transactions were at least $7 million; the Larson/Pfaff Entities' gross fees from OPIS transactions were at least $12 million.

31.    BLIPS was marketed and sold from at least in or about 1999 through at least in or about 2000 to at least 186 wealthy individuals, and generated at least $5.1 billion in phony tax losses; KPMG's gross fees from BLIPS transactions were at least $53 million; the RUBLE Law Firm's gross fees from BLIPS transactions were at least $13 million; the Larson/Pfaff Entities' gross fees from BLIPS transactions were at least $134 million.

32.    SOS was marketed and sold from at least in or about 1998 through

11

at least in or about 2002 to at least 165 wealthy individuals, and generated at least $1.9 billion in phony tax losses; KPMG's gross fees from SOS transactions were at least $17 million.

33.     Among the individuals who used BLIPS and SOS-type shelters to evade their own taxes were the defendants JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, GREGG RITCHIE, RICHARD ROSENTHAL, and DAVID GREENBERG, at least 14 KPMG partners, and other co-conspirators.

The Fraudulent FLIP and OPIS Shelters

34.     In all material respects, FLIP and OPIS were the same.  FLIP and OPIS were generally marketed only to people who had capital gains in excess of $10 million for FLIP and $20 million for OPIS.  These shelters were designed to generate substantial phony capital losses (i.e., in excess of $10 million for FLIP and in excess of $20 million for OPIS) through the use of an entity created in the Cayman Islands (a tax haven).  The client purportedly entered into an "investment" transaction with the Cayman Islands entity by purchasing a purported warrant or entering into a purported swap.  The Cayman Islands entity purportedly made a pre-arranged series of purported investments, including the purchase from either Bank A (which at the time was a KPMG audit client) or Bank D of either Bank A or Bank D stock using money purportedly loaned by Bank A or Bank D, followed by a repurchase of that stock by the pertinent bank at a prearranged price.  For the FLIP and OPIS tax shelter transactions in which the Larson/Pfaff entities

participated, the defendant JOHN LARSON directed the transactions purportedly executed by the Cayman Islands entity.  The purported investments were devised to eliminate economic risk to the client beyond the all-in cost and minimize the portion of the client's all-in cost used for the investment component.  The purported investments also were devised to eliminate economic risk to the bank and to guarantee the fees of KPMG, the defendant RAYMOND J. RUBLE, also known as "R.J. Ruble" and the RUBLE Law Firm, and others.  The tax shelter transactions were devised to last for only approximately 16 to approximately 60 days, and the minimum duration of the shelter was determined by KPMG and the RUBLE Law Firm, rather than by investment performance or strategy.

35.     In return for fees totaling approximately 7% of the desired tax loss, including a fee to KPMG equal to approximately 1.25% of the desired tax loss, the defendants JEFFREY STEIN, JOHN LANNING, JEFFREY EISCHEID, JOHN LARSON, ROBERT PFAFF, LARRY DELAP, STEVEN GREMMINGER, GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, and RICHARD ROSENTHAL, and their co-conspirators implemented and caused to be implemented FLIP and OPIS transactions and generated and caused to be generated false and fraudulent documentation to support the transactions, including but not limited to KPMG opinion letters claiming that the purported tax losses generated by the shelters were more likely than not to withstand

challenge by the IRS.  The defendant RAYMOND J. RUBLE, also known as "R.J.

Ruble" also issued "more likely than not" opinion letters in return for fees typically of

approximately $50,000 per opinion, which opinions tracked, sometimes verbatim, the

KPMG opinion letter.  In general, all of these opinion letters were identical, except for

the names of the clients, the names of the entities, the dates, and the dollar amounts

involved in the transactions.

      36.    The defendants JEFFREY STEIN, JOHN LANNING, JEFFREY

EISCHEID, JOHN LARSON, ROBERT PFAFF, LARRY DELAP, STEVEN

GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG

RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID

RIVKIN, CARL HASTING, and RICHARD ROSENTHAL, and their co-conspirators

issued and caused to be issued opinion letters although, as they well knew, (i) the tax

positions taken were *not* more likely than not to prevail against an IRS challenge if the

true facts regarding those transactions were known to the IRS, and (ii) opinion letters and

other documents used to implement FLIP and OPIS were false and fraudulent in a

number of ways, including but not limited to the following:

      a.    FLIP and OPIS were falsely and misleadingly described as

investment programs, when in truth and in fact, FLIP and OPIS were designed,

marketed, and implemented to generate phony tax losses in order to evade income

taxes for wealthy clients and garner substantial fees and income for KPMG, the

Larson/Pfaff Entities, the RUBLE Law Firm, the defendants JEFFREY STEIN,
JOHN LANNING, JEFFREY EISCHEID, JOHN LARSON, ROBERT PFAFF,
LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also
known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK
WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD
ROSENTHAL, certain co-conspirators, and others.

      b.    Opinion letters began by falsely stating that the client requested
KPMG's opinion "regarding the U.S. federal income tax consequences of certain
investment portfolio transactions," when in truth and in fact, the conspirators
targeted wealthy clients based on the clients' large taxable gains and in return for
substantial fees to KPMG, the Larson/Pfaff Entities, RUBLE and the RUBLE
Law Firm, certain co-conspirators, and others, offered to generate phony tax
losses to eliminate income tax on that gain, and offered to provide a "more likely
than not" opinion letter.

      c.    Opinion letters continued by falsely stating that the "investment
strategy was based on the expectation that a leveraged position in the Foreign
Bank securities would provide investor with the opportunity for capital
appreciation," when in truth and in fact the clients executed the strategy to obtain
the expected phony tax benefits promised by certain conspirators.

      d.    Opinion letters also falsely claimed that the clients "reviewed the

economics underlying the investment strategy and believed it had a reasonable opportunity to earn a reasonable profit from each of the transactions . . . in excess of all associated fees and costs and not including any tax benefits that may occur" when in truth and in fact, there was no such opportunity.

      e.    Opinion letters falsely claimed that one of the participants in the transaction (an owner of the Cayman Islands entity) was a foreign person unrelated to the other participants, when in truth and in fact these foreign persons were simply nominees controlled by the defendants JOHN LARSON and ROBERT PFAFF. In fact, one of the foreign persons involved was an owner of Larson/Pfaff entities.

      f.    Opinion letters falsely stated that money was paid by the FLIP and OPIS clients for an "investment" component of the transactions (a warrant or a swap), when in truth and in fact that money constituted fees paid to KPMG, the Larson/Pfaff entities, the RUBLE Law Firm, the bank participant, and the nominee foreign person, and other participants, as well as money that was temporarily parked in the deal but ultimately returned to the client.

      g.    Opinion letters also falsely claimed that there was no evidence of a "firm and fixed" plan to complete the steps making up the shelter in a particular manner, when in truth and in fact, there was such a plan, and the transactions in fact were completed in the particular manner designed to generate the tax loss.

h.     Opinion letters stated that the clients were "more likely than not" to survive an IRS challenge to the transactions based on the "step transaction doctrine" — a legal doctrine permitting the IRS to disregard certain transactions having no economic substance or business purpose and the purported tax effects of those disregarded transactions.  This assertion was false, as the conspirators well knew.  Indeed, the defendant GREGG RITCHIE, who at the time was in charge of CaTS, instructed KPMG partners involved in marketing OPIS, including the defendants JEFFREY EISCHEID, RANDY BICKHAM, and MARK WATSON, not to permit KPMG clients who were pitched OPIS to retain a copy of KPMG's powerpoint presentation describing the transaction "under any circumstances" because to do so would "DESTROY any chance the client may have to avoid the step transaction doctrine."

37.     The defendants created and caused to be created this false and fraudulent documentation in order to assist clients in claiming the phony tax shelter losses on tax returns and in evading taxes.

The Fraudulent BLIPS Shelter

38.     BLIPS was designed to generate any amount of capital and ordinary tax losses through a series of pre-arranged transactions that involved the client purportedly borrowing money from one of four banks — Bank A, Bank B, Bank C, or Bank E, three of which were audit clients of KPMG at the time — in order to make

17

purported foreign currency investments including currencies that were "pegged" to the United States dollar.  The bank involved in the purported loan also served as the counterparty on all of the purported currency and other transactions involved in BLIPS. The transaction was designed by the defendants RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, RAYMOND J. RUBLE, also known as "R.J. Ruble," RANDY BICKHAM, MARK WATSON, under the supervision of defendants JEFFREY STEIN and JOHN LANNING, and their co-conspirators, and others, so that after a short period of time (virtually always approximately 67 days), the client would exit the purported BLIPS transaction and trigger the desired tax loss.  BLIPS also included a nominal investment component that used only cash contributed by the client and that was not funded or secured by the purported loan.

   39. In return for fees totaling approximately 7% of the desired tax loss, including a fee to KPMG equal to approximately 1.25% of the desired tax loss, a fee to the Larson/Pfaff Entities equal to approximately 2.75% of the desired tax loss, and a fee to RUBLE and the RUBLE Law Firm generally equal to approximately $50,000 per transaction, the defendants JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK

WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, and RICHARD

ROSENTHAL, and their co-conspirators, and others, marketed and caused to be

marketed, and implemented and caused to be implemented the transactions and generated

and caused to be generated false and fraudulent documentation to support the

transactions, including but not limited to opinion letters of KPMG and the RUBLE Law

Firm that claimed that the purported tax losses generated by the shelters were more likely

than not to withstand challenge by the IRS.  In general, all of these opinion letters were

identical, except for the names of the clients and entities involved, the dates, and the

dollar amounts involved in the transactions.

      40.    The defendants JEFFREY STEIN, JOHN LANNING, RICHARD

SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT

PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER,

RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY

BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL

HASTING, and RICHARD ROSENTHAL, and their co-conspirators issued and caused

to be issued the opinion letters although, as they well knew, (i) the tax positions taken

were *not* more likely than not to prevail against an IRS challenge if the true facts

regarding those transactions were known to the IRS, and (ii) the opinion letters and other

documents used to implement BLIPS were false and fraudulent in a number of ways,

including but not limited to the following:

19

a.      BLIPS was falsely and misleadingly described as an investment program, when in truth and in fact, BLIPS was designed, marketed, and implemented to generate phony tax losses in order to eliminate income taxes for wealthy clients and garner substantial fees and income for KPMG, the Larson/Pfaff Entities, the RUBLE Law Firm, the defendants JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, and RICHARD ROSENTHAL, certain co-conspirators, and others.

b.      BLIPS was falsely described as a three-stage, seven-year investment program, when in truth and in fact, all participants were expected to withdraw at the earliest opportunity and within the same tax year in order to obtain their tax losses.  Indeed, the defendants JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, RAYMOND J. RUBLE, also known as "R.J. Ruble," RANDY BICKHAM, and MARK WATSON, caused the opinion letters to contain a false representation (which was adopted by BLIPS clients, including the defendant GREGG RITCHIE and clients to whom the

defendants CAROL WARLEY, DAVID RIVKIN, and CARL HASTING sold
BLIPS) that the duration of the client's participation in the three-phase, seven-year
investment program was dependent upon the performance of the program relative
to alternative investments, when in truth and in fact, the duration of the client's
participation was dependant on the client's desire to obtain the phony tax losses to
be generated.

      c.     BLIPS was falsely described as a "leveraged" investment program,
when in truth and in fact, the purported loan transactions that were part of BLIPS
(and were the aspect of BLIPS that purported to generate the tax loss) were shams
— no money ever left the bank and none of the banks assigned any capital cost to
these purported BLIPS loans.  Indeed, at least two of the banks did not fund the
loans at all — they neither set aside from their own funds nor obtained from the
market any money to cover these purported "loans" and "loan premiums."  In
addition, the sham loans were not in any way used in the purported "investment"
program involving trades relating to pegged currencies but, instead, were used
only to generate a phony tax loss.  The only money used in making and securing
the trades involving pegged currencies as part of BLIPS was money contributed
by the client as part of the 7% all-in cost.

      d.     The BLIPS opinion letters falsely stated that the client (based on the
client's purported "independent review") as well as the Larson/Pfaff Entities

"believed there was a reasonable opportunity to earn a reasonable pre-tax profit from the [BLIPS] transactions," when in truth and in fact, there was no "reasonable likelihood of earning a reasonable pre-tax profit" from BLIPS, and instead the "investment" component of BLIPS was negligible, unrelated to the large sham "loans" that were the key elements of the purported tax benefits of BLIPS, and was simply window dressing for the BLIPS tax shelter fraud.  Indeed, the defendant MARK WATSON, calculated that because none of the purported "loan" proceeds were used in any investments, the small "investment" component funded with a portion of the 7% all-in cost would have to generate a 240% annual return in order to cover a portion of the large fees paid to the bank, and would require an even higher return to cover fees paid to KPMG and other conspirators and participants, just to break even.  WATSON performed this calculation and distributed it to others involved in designing, reviewing, and approving BLIPS prior to the implementation of any BLIPS transaction and prior to the issuance of any KPMG BLIPS opinion letters.

e.     The opinion letters and other documents were misleadingly drafted to create the false impression that KPMG, the Larson/Pfaff Entities, the RUBLE Law Firm, and the banks were all independent service providers and advisors, when in truth and in fact they jointly developed and marketed the BLIPS shelter. Thus, for example, the KPMG BLIPS opinion letter misleadingly claimed that the

client "requested our opinion regarding the U.S. federal income tax consequences of certain investment transactions that have been concluded" but the opinion letters, which falsely described a purported seven-year investment program and a withdrawal from that program based on the purported investment performance of the program, were drafted prior to the commencement of any BLIPS transaction.

    f.  Similarly, the KPMG engagement letter used for BLIPS contained the following false and fraudulent statements, among others, (i) that the client had engaged KPMG "to provide tax consulting services . . . with respect to participation in an investment program involving investments in foreign currency positions," when in truth and in fact KPMG marketed a tax shelter to the clients, and the clients engaged KPMG to assist the clients in generating phony tax losses using the tax shelter; (ii) that KPMG "understands that Client intends to engage" the Larson/Pfaff Entities "to provide Client with investment advisory services and trading strategies," when in truth and in fact, the Larson/Pfaff Entities were engaged to assist the clients in generating phony tax losses using a tax shelter; (iii) that the Larson/Pfaff Entities "had advised the Client that the utilization of a high degree of leverage is integral to the Investment Program," when in truth and in fact, the purported "leverage" was a sham loan designed only to support the creation of phony tax losses; and (iv) that KPMG's fees would not be dependent on "the amount of any tax savings projected," when in truth and in fact the

amount of KPMG's fee, as well as the size of the nominal investment made as part

of the fraudulent tax shelter, and fees for the Larson/Pfaff Entities and other

participants in the transaction were all determined by the amount of phony tax

losses desired by the client to offset income or gain received from other sources.

41.    The defendants created and caused to be created this false and

fraudulent documentation in order to assist clients in claiming the phony tax shelter

losses on tax returns and in evading taxes.

42.    At various points during the development of BLIPS, the defendants

RICHARD SMITH, PHILIP WIESNER, LARRY DELAP, and MARK WATSON, their

co-conspirators, and others, identified various significant defects of BLIPS, including

that the description of BLIPS and the factual representations contained in the BLIPS

opinion letter and in other documents were false, but nevertheless in 1999, SMITH,

WIESNER, DELAP, and WATSON, and their co-conspirators, approved the marketing

of BLIPS.  When Washington National Tax approved the BLIPS documentation in

August 1999, the defendant RANDY BICKHAM, who helped devise BLIPS wrote to

the defendant RAYMOND J. RUBLE, also known as "R.J. Ruble": "We have received

our 'get out of jail free card' from [Washington National Tax]."

43.    On or about February 11, 2000, a law firm representing certain

prospective BLIPS clients ("Law Firm 2") sent a memorandum (the "Law Firm 2

Memo") to defendant DAVID RIVKIN stating, in substance and in part, that the draft

BLIPS opinion letters to be issued by KPMG and the RUBLE Law Firm (i) omitted

material facts, and (ii) contained false and misleading factual statements and

representations.  At the time, Law Firm 2 had an ongoing and long-standing attorney-

client relationship with KPMG, although not with respect to the BLIPS transaction.  The

Law Firm 2 Memo was forwarded at least to the defendants JEFFREY EISCHEID,

STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble,"

RANDY BICKHAM, and MARK WATSON.

        44.    In or about February 24, 2000, the defendant PHILIP WIESNER

wrote to the defendants JEFFREY STEIN, JOHN LANNING, LARRY DELAP, MARK

WATSON, and others that (a) of the BLIPS transactions implemented in 1999, all clients

terminated the transaction at their earliest opportunity and prior to year-end 1999, and (b)

questioned whether the factual representations in future BLIPS transactions would be

credible, but nevertheless recommended that BLIPS opinion letters for the 1999

transactions be issued without revision.

        45.    In addition, in or about March 2000, and prior to the issuance of any

BLIPS opinion letters to clients, during a meeting attended by the defendants JEFFREY

STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, LARRY

DELAP, and STEVEN GREMMINGER, and others, DELAP told the other participants

in substance and in part that if the IRS litigates BLIPS in court, the client would "lose."

In addition, another member of KPMG's tax leadership informed the participants at the

meeting, in substance and in part, that the tax position taken in BLIPS was "close to frivolous." During that meeting, the participants also discussed the risks of proceeding with tax shelter transactions like BLIPS, including the risk of criminal investigation, civil penalties, civil liability for fraud, action by the IRS's Director of Professional Practice, and action by state Boards of Accountancy. Nevertheless, and despite the obviously fraudulent nature of BLIPS and the warnings conveyed, the defendants JEFFREY STEIN and JOHN LANNING, and others, decided not to refund BLIPS fees and to proceed (i) with the issuance of "more likely than not" opinion letters on all of the 1999 transactions with the intent that BLIPS clients would claim the phony BLIPS losses on 1999 tax returns, and (ii) continued to implement more BLIPS tax shelter transactions in 2000 and, in 2001, to issue opinions to support those transactions and the claiming of those BLIPS losses.

46.     In addition, in or about March 2000, the defendant STEVEN GREMMINGER telephoned KPMG's relationship partner at Law Firm 2 about the Law Firm 2 Memo and stated that Law Firm 2 was interfering with a KPMG tax transaction and that senior tax partners at KPMG were irate.

The Fraudulent SOS Shelters

47.     These shelters were designed to generate substantial capital and ordinary tax losses through a series of pre-arranged transactions that involved the clients entering into virtually offsetting foreign currency option positions with a bank, including

26

but not limited to Bank A, sometimes transferring the offsetting positions to a partnership

or other entity, and then withdrawing from the transaction, claiming a loss in the desired

amount.  These shelters were referred to by various names, including Short Option

Strategy, Spread Option Strategy, Split Option Strategy, SOS, Binary Option, Digital

Option, Gain Mitigator, Loss Generator, COINS, BEST, FX Transaction (hereinafter

"SOS").  KPMG's Washington National Tax office and the defendant RICHARD

SMITH considered whether KPMG could issue "more likely than not" opinions

regarding SOS transactions, and they concluded that the phony losses generated by those

transactions were *not* more likely than not to withstand IRS challenge.  Moreover,

KPMG's Washington National Tax office and the defendant RICHARD SMITH

reviewed draft "more likely than not" SOS opinion letters prepared by the defendant

RAYMOND J. RUBLE, also known as "R.J. Ruble," and other firms, and determined

that the transactions described therein were not more likely than not to withstand IRS

challenge.  Nevertheless, between 1998 and 2002, the defendants JEFFREY STEIN,

RICHARD SMITH, JEFFREY EISCHEID, LARRY DELAP, STEVEN

GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," RANDY

BICKHAM, CAROL WARLEY, CARL HASTING, and RICHARD ROSENTHAL,

and their co-conspirators, assisted in marketing and implementing SOS transactions for

KPMG clients for a fee to KPMG generally not less than 1% of the tax losses to be

generated, and prepared and caused to be prepared tax returns based on the phony SOS

tax losses.  For many of these SOS transactions, KPMG did not issue an opinion letter, but instead certain lawyers, including RUBLE, issued "more likely than not" opinion letters with respect to those transactions so that clients would claim the fraudulent SOS losses and evade taxes.

48.     In addition, from at least in or about 1999 through at least in or about 2002, the defendant DAVID GREENBERG, with the approval of members of KPMG's tax leadership, including the defendants JEFFREY STEIN, RICHARD SMITH, and RICHARD ROSENTHAL, marketed and implemented dozens of SOS transactions to KPMG clients, often charging fees well in excess of 1% of the phony tax loss to be generated.  GREENBERG also arranged SOS transactions for at least 14 KPMG partners, including for the defendant RICHARD ROSENTHAL.  In connection with the SOS transactions arranged by GREENBERG, GREENBERG issued KPMG opinion letters or caused others to issue opinion letters that falsely claimed that the tax losses purportedly generated by SOS were more likely than not to withstand IRS challenge, so that KPMG partners and GREENBERG's other clients would claim the fraudulent SOS losses and evade taxes.

49.     SOS opinion letters, and other associated documents, were false and fraudulent in a number of ways well known to the conspirators, including the following:

a.     They falsely and misleadingly describe SOS as an investment, when in truth and in fact, it was a tax shelter designed and marketed to generate tax

losses in order to eliminate income taxes for wealthy clients and garner substantial fees and income for KPMG, the RUBLE Law Firm, certain co-conspirators, and others.

b.     They falsely claimed that the client would have entered into the option positions independent of the other steps that made up SOS, when in truth and in fact, the clients would not have entered into those positions absent the anticipated tax loss to be generated.

c.     They falsely claim that the option positions were contributed to a partnership or other entity to "diversify" the client's "investment" when in truth and in fact, the contribution was simply a necessary step in the tax shelter, was executed for the purpose of generating the tax loss, and was not executed to "diversify" any "investment."

d.     They falsely claim that the offsetting option positions were entered into for "substantial non-tax business reasons," and were contributed to the partnership or other entity for "substantial non-tax business reasons," when in truth and in fact, the transactions were undertaken in order to generate the phony tax losses SOS purported to generate and not for any "substantial non-tax business reason."

50.     The defendants created and caused to be created this false and fraudulent documentation in order to assist clients in claiming the phony tax shelter

losses on tax returns and in evading taxes.

51.    Many of the SOS transactions marketed by the defendants CAROL

WARLEY, CARL HASTING, DAVID GREENBERG and others at KPMG to KPMG

clients were arranged and implemented by a tax shelter firm located in New York, New

York (the "Shelter Boutique").  In addition, the defendant RICHARD ROSENTHAL's

SOS transaction was arranged with the Shelter Boutique.  The principal of the Shelter

Boutique is a co-conspirator not named as a defendant herein ("CC 10").

**Side Payments to RUBLE**

52.    In addition to the fees collected by the RUBLE Law Firm for the

issuance of opinion letters on SOS and other tax shelter transactions, RUBLE accepted

side payments for his benefit from the Shelter Boutique and other entities controlled by

CC 10.  The CC-10-related side payments to RUBLE totalled over $3 million.  The CC-

10-related side payments were not reported to the IRS by CC 10 or any entity controlled

by CC 10, and RUBLE failed to report to the IRS over $700,000 of these side payments.

In addition, the defendants JOHN LARSON and ROBERT PFAFF caused nominee

entities to make side payments to RUBLE for his participation in tax shelter transactions.

The LARSON and PFAFF side payments to RUBLE totalled approximately $500,000,

and they were not reported to the IRS by LARSON, PFAFF, or RUBLE, or by any

entities controlled by LARSON, PFAFF, or RUBLE.

53.    Although, during the period 2001 through 2003, RUBLE received

millions of dollars in side payments relating to his participation in devising, marketing, and implementing tax shelters, RUBLE falsely stated to the RUBLE Law Firm that he had no outside income.

**Fraudulent Concealment of Tax Shelters**

54.     In addition to preparing and causing to be prepared false and fraudulent documentation relating to and implementing the shelter transactions, and in addition to preparing and causing to be prepared tax returns that fraudulently incorporated the phony tax shelter losses, the defendants JEFFREY STEIN, JOHN LANNING, RICHARD SMITH, JEFFREY EISCHEID, PHILIP WIESNER, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, MARK WATSON, CAROL WARLEY, DAVID RIVKIN, CARL HASTING, RICHARD ROSENTHAL, and DAVID GREENBERG and their co-conspirators employed various means fraudulently to conceal from the IRS the fraudulent tax shelters they designed, marketed and implemented, including but not limited to the following: (i) not registering the tax shelters with the IRS as required by law; (ii) preparing and causing to be prepared tax returns that fraudulently concealed the phony losses from the IRS; (iii) attempting to conceal from the IRS the tax shelter losses and transactions with sham attorney-client privilege claims; and (iv) obstructing IRS and Senate investigations into their tax shelter activities.

31

Failing to Register Tax Shelters

55.    Under the law in effect at all times relevant to this Indictment, an organizer of a tax shelter was required to "register" the shelter by filing a form with the IRS describing the transaction.  The IRS in turn would issue a number to the shelter, and all individuals or entities claiming a benefit from the shelter were required to include with their income tax returns a form disclosing that they had participated in a registered tax shelter, and disclosing the assigned registration number.  Notwithstanding these legal requirements, the defendants JEFFREY STEIN, JOHN LANNING, JEFFREY EISCHEID, JOHN LARSON, ROBERT PFAFF, DAVID AMIR MAKOV, LARRY DELAP, STEVEN GREMMINGER, RAYMOND J. RUBLE, also known as "R.J. Ruble," GREGG RITCHIE, RANDY BICKHAM, and DAVID GREENBERG and their co-conspirators caused the entities with which they were associated not to register as required any of the tax shelters they devised, marketed and implemented, and thereby ensured that registration numbers would not be included on returns relating to unregistered shelters.

56.    The defendants JOHN LANNING and JEFFREY STEIN and their co-conspirators decided not to register FLIP, OPIS, or BLIPS based on a "business decision" that to register the shelters would hamper KPMG's ability to sell them, and that the IRS penalties applicable to a failure to register would be dwarfed by the lucrative fees KPMG stood to collect from selling unregistered tax shelters.  Indeed, the defendant

32

GREGG RITCHIE, the head of the CaTS practice, wrote a memorandum to the

defendant JEFFREY STEIN arguing that, assuming OPIS was required to be registered,

KPMG should make a "business decision" not to register OPIS because (i) registering the

shelters would put KPMG at a competitive disadvantage as compared to other accounting

firms, law firms, and other firms that were promoting tax shelters; and (ii) selling

unregistered shelters would be so lucrative that the benefits outweighed the risk of civil

penalties that might be imposed.  Moreover, the defendant STEVEN GREMMINGER,

among others, advised that by deciding not to register tax shelters, KPMG risked

criminal prosecution, but advised that KPMG's tax leadership could nevertheless "make

a business decision to not register the activity as a tax shelter."  The defendant LARRY

DELAP concurred in this advice.

### Fraudulently Concealing Shelter Losses and Income on Tax Returns

57.     The conspirators would and did prepare and cause to be prepared tax

returns that were false and misleading and were intended fraudulently to conceal the

fraudulent tax shelters from the IRS in a number of ways, including but not limited to the

following:

a.     Although the law requires that an individual's items of income, gain,

and loss be reported on an individual income tax return, the defendants JEFFREY

EISCHEID, JOHN LARSON, DAVID AMIR MAKOV, GREGG RITCHIE, and

CARL HASTING, and their co-conspirators advised certain clients that the phony

33

tax shelter losses and the income or gains that were to be sheltered should not be reported on the client's individual income tax return, and instead only the net of those two figures should be reported on the return. One method of "netting" pursued by the conspirators in order fraudulently to hide the tax shelter transactions from the IRS involved using a "grantor trust." A grantor trust is a trust that, because of certain features enumerated in the tax code, is disregarded as an entity for federal income tax purposes. RITCHIE and his co-conspirators devised a scheme to insert a grantor trust into a tax shelter transaction, and then, rather than disregarding the grantor trust as required by the tax code, reporting the large phony tax shelter loss and the taxable gain or income those losses were used to offset only on the grantor trust information return, while reporting only the small net of those numbers on the client's individual income tax return. Although the defendant MARK WATSON notified other members of the Innovative Strategies group, including the defendants JEFFREY EISCHEID, RANDY BICKHAM, DAVID RIVKIN, and CARL HASTING, as well as the defendant LARRY DELAP, that to pursue this "grantor trust netting" scheme was *not* a proper reporting position, and in fact would result in the filing of false income tax returns, EISCHEID instructed KPMG partners that each could decide for himself or herself whether to engage in grantor trust netting. As a result, dozens of tax returns for FLIP, OPIS, and BLIPS clients used grantor trusts fraudulently to hide

the tax shelter losses (and the gains they were designed to shelter) on the clients'

individual income tax returns.

   b.  In order to conceal tax shelter losses from the IRS, the defendants

CAROL WARLEY, DAVID AMIR MAKOV and others, advised at least one

client that phony tax shelter losses could be concealed and made to look like

losses from the sale of a number of publicly traded stocks.  In order to so conceal

the losses, the Larson/Pfaff Entities purchased publicly traded stock on behalf of

the shelter client, and then distributed those stocks to the client upon the client's

withdrawal from the transaction.  WARLEY and others then advised that the

shelter could be concealed on the client's tax return and instead reported as losses

resulting from the sale of the stock so distributed.  In order to further conceal the

phony tax shelter losses from the IRS, in some instances WARLEY, the defendant

GREGG RITCHIE and others selected stocks that had already suffered large

losses during the year as the stocks to which the shelter losses would be attached,

in order to mislead the IRS into believing that the losses resulted from those

stocks' poor performance, rather than from the fraudulent tax shelters.

Concealing Shelters with Sham Attorney-Client Privilege Claims

   58.  The conspirators also attempted to conceal their fraudulent tax

shelter activities by attempting to cloak communications regarding those activities and

certain of the activities themselves with the attorney-client privilege, although the