UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

     -against-                                    S1 05 Crim. 0888 (LAK)

JEFFREY STEIN, et al.,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM AND ORDER
### (Corrected)

Lewis A. Kaplan, *District Judge.*

        The 19 defendant, 46 count superseding indictment charges what has been described as the largest criminal tax case in United States history. The core of the indictment asserts that 17 former partners and managers at the prominent accounting firm KPMG LLP, one former partner at a prominent law firm, and one additional defendant conspired to participate in a scheme to defraud the Internal Revenue Service ("IRS") by devising, marketing and implementing fraudulent tax shelters, by preparing and filing false and fraudulent income tax returns, and by fraudulently concealing the tax shelters from the IRS. The government claims that their activities caused a tax loss to the United States Treasury of more than $2 billion. The matter now is before the Court on the motion of defendant David Greenberg for release on bail. The government resists the motion, claiming that Greenberg, if released prior to trial, would be a danger to the community as well as a substantial flight risk.

*Prior Proceedings*

Greenberg was arrested in California. The government there sought an order of detention. Following a two day hearing, Magistrate Judge Andrew J. Wistrich granted the order, finding that no condition or combination of conditions would reasonable assure Greenberg's appearance as required, but rejected the government's contention that detention was warranted to ensure the safety of the community. The Magistrate Judge wrote:

> "Defendant faces a very lengthy sentence if convicted, defendant possesses substantial assets and participates in a complex network of entities involving several large asset transfers, assets of defendant and proposed sureties may (or may not) be proceeds of illegal offense (in whole or in part), defendant has traveled abroad, defendant allegedly stated an intention to flee to a co-conspirator and allegedly boasted of hidden assets."

He added also that:

> "This conclusion is limited to the record presently before the court, and without prejudice to its being revisited at a later date. Defendant has addressed some of the court's concerns about risk of non-appearance, and there is a realistic possibility that the remaining concerns could be satisfactorily mitigated by a substantial bond secured by justified affidavits of surety backed up by the deeding of real property. The complexity and likely duration of the steps required to investigate the assets of defendant and the sureties and to deed the real property, however, suggest that the matter is better addressed in the charging district so that proceedings there will not be delayed."

Following this order, Greenberg was transferred to this district and made the present motion. The Court held a hearing on November 7, 2005, at which it inquired whether either side wished to present witnesses. Neither so desired.[1]

---

[1] Tr., Nov. 7, 2005 ("Tr.") 2.

*The Bail Reform Act*

The Bail Reform Act provides in substance and in relevant part that a defendant such as Greenberg is entitled to release pending trial unless the court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."[2] An order of detention based on the safety of other persons and the community must rest on a finding supported by clear and convincing evidence.[3]

*Danger to Others and to the Community*

Despite the rejection of the argument by the Magistrate Judge in Los Angeles, the government again presses the argument that detention of Greenberg is necessary in order to ensure the safety of the community. Its position rests principally on a proffer of the anticipated testimony of Steven Acosta, a cooperating witness.

The government proffers that Acosta will testify that Greenberg caused to be executed false and fraudulent tax shelter documents, paid Acosta to pose as an independent investment advisor in the tax shelter transactions and as owner of the tax shelter entities, agreed to assist in the filing of a false and fraudulent 2000 income tax return by a West Coast attorney, and asked Acosta to sign certain documents in a manner and for the purpose of obstructing the investigation that culminated in this indictment.

While the government's proffer certainly supports the assertion that the defendant has

---

[2]

18 U.S.C. § 3142(e).

[3]

*Id.* § 3142(f).

engaged in fraudulent activities in the past, it has made no real effort to suggest that there is a substantial risk that he will continue to do so if released pending trial, particularly given the change in his personal circumstances.  So the danger argument comes down to an assertion that Greenberg is likely to tamper with witnesses or attempt to obstruct justice if released on bail.

The Court agrees in principle that nonviolent witness tampering and obstruction poses a danger to the community and that the risk of such activities, in an appropriate case, would support pretrial detention.[4]  Here, the government proffers that Greenberg, after he became aware of the investigation, asked Acosta to sign documents as owner and president of entities used in the tax shelter transactions implemented by Greenberg and, on one occasion, asked him to use different pens to create the false impression that the documents were signed at different times.

The Court assumes *arguendo* that the incidents in question occurred, noting in particular that Greenberg's proffer did not specifically controvert Acosta's account (although it did include a general attack on Acosta's credibility).  Nevertheless, the Court is not persuaded by clear and convincing evidence that a release of Greenberg pending trial could not be conditioned in a manner that would probably eliminate, and in any case greatly diminish, the risk of witness tampering or obstruction.  Greenberg therefore will not be detained on the ground that his release would create a danger to the community.

## Flight Risk

The government's flight risk argument is far more substantial.  Given the enormous

---

[4]  *E.g., United States v. LaFontaine,* 210 F.3d 125, 132 (2d Cir. 2000).

size of the tax loss and Greenberg's alleged role in the conspiracy, he would face a sentence of more than 25 years imprisonment under the Sentencing Guidelines in the event of conviction,[5] certainly a motive to flee. He allegedly told Acosta that, if indicted, he had about $16 to $20 million in his ex-wife's name that no one could get and that he would take the money and "take off." Moreover, the government contends that Greenberg has structured his finances so that he holds few if any assets directly but controls millions of dollars that he has placed in the names of others, including his ex-wife, and that he has not accounted for millions of dollars that passed through his hands.

*The Alleged Statement to Acosta*

In the proceedings in California, the Pretrial Services report attributed to the government a claim that Greenberg had told a co-conspirator that "he had access to a 16 to 20 million secret account in his ex-wife's name and [would] 'take off' if he were indicted." At the detention hearing, the government proffered that Greenberg had boasted to Acosta in January 2005 that he would take $16 to $20 million that was in his wife's name and "take off" but it said nothing about any secret account.[6] In responding, Greenberg's counsel attacked the claim of a secret account,[7] but did not deny the thrust of the statement attributed by Acosta to Greenberg. Rather,

---

[5] The Court would not be obliged to impose a Guideline sentence in light of *Untied States v. Booker,* 125 S.Ct. 738 (2005). In an abundance of caution, it adds that its notation of this fact is not intended to imply anything concerning the relationship between any sentences that ultimately might be imposed in this case and the applicable Sentencing Guidelines ranges.

[6] Tr., Oct. 19, 2005, at 5.

[7] *Id.* at 12-13.

counsel merely deprecated the idea of detaining Greenberg on the basis of "an excited utterance" or "a hyberbolic comment,"[8] even if he made it.

This pattern continues in the present motion. Greenberg's opening brief again makes a point of denying the existence of a "secret account" but is silent on the question whether Greenberg told Acosta in substance that there was a lot of money in his ex-wife's name and that he would flee if indicted.[9] Counsel's proffer at the hearing was similar.[10]

Notwithstanding the lack of a direct denial, the Court in other circumstances might be reluctant to base a finding of flight risk on a proffer of this sort from a cooperating witness. In this case, however, the proffer is not without corroboration.

In or about April 2004, Greenberg formed Laura Adams LLC ("Adams"), a limited liability company the members of which are his former wife and his father, the respective ownership interests of whom are 99.9 percent and 0.1 percent, respectively,[11] and subsequently transferred to it "all the real estate holdings of JPF VI . . . and a single bank account (a Deutsche Bank account)."[12] The real estate collectively amounted to at least $8.17 million. The Deutsche Bank account

---

[8] *Id.* at 14.

[9] Def. Mem. 12-13

[10] Tr. 11-12.

[11] The operating agreement is dated as of April 7, 2004. The record is silent as to the actual date of its creation.

[12] Def. Mem. 16.

It appears that the Deutsche Bank account may have been transferred in January 2005.

contained between $3 million and $5 million.[13]  Thus, Greenberg placed in Adams at least $11 million and perhaps as much as $13 million or more.

Greenberg claims that this was no secret account – Adams and its assets are disclosed in his former wife's declaration on this motion.  But the situation must be viewed as of early 2005, when Greenberg allegedly made the statement to Acosta.

The Adams operating agreement purports to be signed by both of its members – Laura and Harry Greenberg.  Even the most cursory examination, however, reveals that the two signatures probably were affixed by one person – the name "Greenberg" in both signatures is exceptionally similar.  Even more to the point, the purported signatures of Laura and Harry Greenberg on the operating agreement bear no resemblance whatever to the signatures on their respective declarations submitted in support of this motion:

---

[13] The government contends that the figure was $5 million.  Tr. 16.  Greenberg says it was $3 million.  *Id.* 34.

**OPERATING AGREEMENT SIGNATURES**



"HG"

HARRY GREENBERG, an individual

"LA"

LAURA ADAMS, an individual

**DECLARATION SIGNATURES**



Harry Greenberg

Laura Greenberg

In consequence, assuming that the purported signatures on the declarations submitted to this Court are genuine, it is quite unlikely that Laura Greenberg signed the operating agreement forming Adams.

This becomes highly significant in light of another aspect of the government's proffer that the defendant has not questioned. According to the proffer, Ms. Greenberg was entirely unaware of the formation of Adams and learned of its existence only by mistake – through a mass mailing by a third party to recent transferees of real property in consequence of Greenberg's transfer of real estate into Adams.[14] Accordingly, the circumstances suggest the following:

- Greenberg formed Adams, supposedly owned and controlled by his former wife, without the former wife's knowledge and kept its existence from her. She discovered it by accident.

---

[14] Tr. 15.

- As neither Ms. Greenberg nor the defendant's father signed the Adams operating agreement, either defendant or someone acting at his behest did so.

- As Greenberg apparently had the ability to duplicate the signatures on the operating agreement, Greenberg evidently had complete control over the assets in Adams, at least prior to Laura Greenberg's accidental discovery of its existence and possibly beyond.[15]

- When Greenberg allegedly spoke with Acosta in early 2005, Laura Adams LLC could readily have been described as a secret account in his wife's name that contained more than $11 million in assets.

- The timing of Greenberg's alleged statement to Acosta in early 2005 coincides with the timing of his transfer of the Deutsche Bank account and came not long after his transfer of the real estate to Adams.

Accordingly, the Court for present purposes credits the government's proffer concerning defendant's alleged statement to Acosta. It finds that defendant has expressed an intention to flee in the event of the indictment and to finance his flight with assets including those of Adams.

---

[15] The fact that Greenberg's father was designated manager of Adams does not alter this conclusion. First, Greenberg told IRS agents in a proffer session that Greenberg himself manages Adams. Def. Mem. Ex. E, at 2. Second, given the fact that Greenberg's father's signature on the operating agreement appears not to be authentic, it is likely that he was in the dark as well and that the defendant or whoever signed the father's name to the operating agreement for him was fully capable of producing another signature matching that on the operating agreement in order to exercise control over the assets.

*Greenberg's Financial Situation*

The parties have favored the Court with a good deal of information concerning Greenberg's financial situation and the economic circumstances of some members of his family. While the information is far from complete, several things appear to be clear:

    *1.    Greenberg*

        *a.    The Financial Statement*

Greenberg has submitted a financial statement as of September 30, 2005, which claims total assets of $14.3 million (of which $11.7 million is real estate), liabilities of $2.3 million and a net worth of $12.0 million.[16] Examination of the statement and other materials of record suggests quite a different picture.

To begin with, the $11.7 million in real estate consists of three properties, a house in Florida ($7.0 million), another in California ($4.5 million), and a 1/3 interest in a property in Mammoth Lakes, California ($0.2 million). As the financial statement indicates, the Florida and California houses are not owned by Greenberg. The Florida property belongs to the David Greenberg Trust and the California property by ERN Finance Company, Ltd. ("ERN"), both of which are discussed below.

Analysis of other assets reveals a similar pattern. The statement lists cash of $2.9 million. Of that figure, however, $2.0 million is the retainer Greenberg paid counsel and over $380,000 is in accounts of JPF V, LLC ("JPF V"). Of the $1.0 million of other investments listed,

---

[16]     Def. Mem. Ex. N.

$543,000 belongs to JPF VI, LLC ("JPF VI") and about $408,000 belongs to JPF V. Greenberg claims not to own either entity.

Hence, if we take at face value the attributions of ownership of assets on Greenberg's financial statement to other entities, the financial statement would look more like this:

| ASSETS | | | LIABILITIES | | |
|---|---|---|---|---|---|
| Cash | $ | 528,364 | Borrowings | $ | 2,387,135 |
| Retainer | | 2,000,000 | | | |
| Notes receivable | | 1,364,250 | | | |
| Investments | | 111,478 | | | |
| Real estate | | 200,000 | | | |
| Other assets | | 260,000 | Net worth | | 2,076,957 |
| TOTAL | $ | 4,464,092 | TOTAL | $ | 4,464,092 |

In other words, according to the financial statement he submitted, Greenberg's net worth, exclusive of the retainer that he is using to defend this case, is close to zero – unless of course he owns or effectively controls the assets placed in JPF V and VI, ERN, and the David Greenberg Trust as well as those in the hands of his former wife.

It developed at the hearing that the financial statement, whatever its deficiencies, does not even purport to be the whole story. The government proffered that Greenberg is a 50 percent owner of an entity called GG Capital that is worth about $9 million.[17] Greenberg does not deny that

---

[17] Tr. 19-20, 25.

he is a 50 percent owner or that he omitted his interest from the financial statement he submitted.[18]

He claims, however, that "[t]here is not a single dollar in it today for David Greenberg that adds to

his net worth"[19] although he has admitted elsewhere that GG Capital earned $20 to $30 million in

gross income between 1999 and August of this year.[20] No comprehensible explanation for why this

is so was offered. Nor were any financial statements or other information that might explain this

provided.

b.      *Laura Greenberg – the Former Wife*

Laura Greenberg, the defendant's former wife, claims a net worth of $12.1 million.

Of this total, however, $2 million is a note receivable from Greenberg – Laura Greenberg paid the

retainer for him – and $9.845 million is cash and real estate owned by Adams. From the materials

submitted to the Court, she appears to have no meaningful assets apart from her interest in Adams.

c.      *The Entities*

The facts concerning the various entities that own property shown on the financial

statements of Greenberg and his former wife are somewhat tangled. Key points, however, appear

to be as follows:

1.      Greenberg created JPF V and JPF VI in 1998 with himself as the initial

---

[18]

    *Id.*

[19]

    *Id.*

[20]

    Def. Mem. Ex. E, at 3.

manager. He transferred most of his liquid assets to JPF V and most of his real estate to JPF VI. JPF V wholly owns JPF VI.

2.    In about March 2002, the IRS began serving summonses on KPMG, and it was well known that the Service was cracking down on tax shelters.[21]

3.    Later in 2002, Greenberg made his three children owners of approximately 95 percent of JPF V and thus of its wholly owned subsidiary, JPF VI, allegedly to implement an April 15, 2002 court order in connection with his divorce from Laura Greenberg.[22]    In fact, the defendant's reliance on the court order is not well placed. His child support obligation was $3,000 per month per child. The court order was a consented-to arrangement whereby the parties agreed that the child support was inadequate, that each of the two minor children required up to $25,000 *per month,* and that Greenberg would transfer JPF V, which he represented to be worth at least $9 million, to the children in substantial satisfaction of his child support obligation, with his father and ex-wife to act as trustees and co-managers until the children reached majority. In view of the dubious nature of the proposition that these two minor children required child support of $50,000 per month ($600,000 per year), the transfer of ownership in JPF V must have been intended to do far more than satisfy any child support obligation.[23]    Moreover, despite the fact that the April 15, 2002 order recited that defendant's father and ex-wife would act as trustees and co-managers, current

---

[21]    Tr. 21.

[22]    Def. Mem. 15-16.

[23]    A principal payment of $9 million, invested at 5 percent, would have funded a $50,000 per month annuity for 25 or more years, far beyond the remaining durations of the children's minorities.

JPF V and JPF VI statements from Citigroup and Deutsche Bank Alex. Brown, respectively, are addressed to the attention of the defendant.

4.	In early 2003, the United States Senate Permanent Subcommittee on Investigations served subpoenas on KPMG.  Greenberg was interviewed by KPMG attorneys in connection with that investigation.[24]

5.	Greenberg created ERN, a British Virgin Islands company, in September 2003.  The documents submitted do not clearly establish ERN's ownership and management.  Stock certificates suggest that Greenberg and his father each owns 50 percent of the shares[25] and that Greenberg is the sole director.  Other documents suggest that the father is or at least was the sole director.  Still others suggest that Greenberg is the sole shareholder.  In any case, ERN appears to own Greenberg's house in Newport Beach, California, one of his two alleged primary residences and a property said to have equity of $4.5 million.

6.	In 2004, Greenberg created the David B. Greenberg 2004 Family Trust (the "Trust") with his father as sole trustee and his children as sole beneficiaries.  He transferred one of his two alleged primary residences, a house in Florida with an equity said to be $7.0 million, to the Trust.

7.	As noted, Greenberg created Adams in or about April 2004 and claims then to have transferred all of the real estate holdings of JPF VI and a JPF VI bank account to it.  According to an unsworn statement in his memorandum, this transfer "mov[ed] from JPF V and VI

---

[24]	Tr. 22.

[25]	Defendant's memorandum claims that he is the sole owner.  Def. Mem. 14.

all the property and funds which Mr. Greenberg was ordered to give to his wife and children pursuant to the April 15, 2002 court order."[26]  As discussed above, Adams appears to have been entirely under Greenberg's control until his former wife inadvertently learned of its existence and may remain so.

8.    In about May 2004, Acosta told Greenberg that a special agent was investigation one of his tax shelters.[27]

9.    Defendant concedes that the defendant's use of the legal entities he created was motivated by a desire to protect his assets from the "risk of litigation from a disgruntled client."[28]  The timing is consistent also with a motive born of the investigation that led to this indictment.  In other words, Greenberg tried to make himself substantially judgment proof, concededly to defeat collection of judgments by former clients and perhaps also to ensure the availability of funds if he were indicted.

*   *   *

When all is said and done, Greenberg, his former wife, and the entities described above, according to the financial statements Greenberg and his former wife have provided, collectively have approximately $20 million in assets, net of the $2 million retainer held by

---

[26] Def. Mem. 16 (footnote omitted).

[27] Tr. 22.

[28] *Id*. 14.

Greenberg's counsel. The $20 million consists of approximately $15.8 million in real estate,[29] $1.36 million in notes receivable, and about $2.8 million in cash and other assets. All of the real estate (save the defendant's interest in the Mammoth property) and over $1.3 million in cash – or more than $17.6 million overall – is nominally owned by the JPF entities, ERN, the Trust and Adams.

*Discussion*

Defendant argues that there is little risk of flight. He did not flee in the weeks leading up to the indictment although he knew of the likelihood of filing charges. He claims strong family ties. And he stresses that his close participation with counsel in the preparation of his defense will be important given the complex nature of the charges and the evidence. He contends that a bond secured by a substantial amount of real estate said to be owned by him and members of his family would be adequate to secure his appearance.

Defendant's arguments have force. Moreover, with trial scheduled to commence in September 2006, a detention order in effect would be a jail sentence of almost a year without any trial or determination of guilt, a situation to be avoided if at all possible. Nevertheless, the Court is persuaded that there is a very substantial risk of flight in this case and that the proposed bail package, at least in the absence of considerably more information than has been provided to date, is not adequate to secure defendant's presence.

First, the defendant has a substantial motive to flee given the severity of the sentence he may face in the event of conviction.

---

[29] Corona Del Mar ($2.2 million), Newport Beach ($1.2 million), Irvine ($0.7 million), Del Rey Beach ($7.0 million), Newport Beach #2 ($4.5 million), and Mammoth ($0.2 million).

Second, defendant's alleged statement to Acosta most likely betrayed an intention to flee.[30] While the Court is mindful of the fact that the proffer was neither under oath nor tested by cross-examination, it is persuasive both because the defendant has not directly denied it and, even more important, because it is corroborated to a substantial degree by the facts concerning Adams. At the time of the alleged statement, it was an essentially secret account in the name of Greenberg's former wife with assets of at least $11 million. Defendant's failure to flee prior to his arrest, while significant, may be attributable to a hope that no indictment would be returned, concern that he was under surveillance, an intention to flee later, or other circumstances.

Third, the defendant placed millions of dollars of his assets in a web of legal entities, almost all of which are nominally owned by family members. He claims that he did this for the purpose of "asset protection." While the defense argues that there is nothing wrong with this,[31] that is beside the point. What is significant is that the defendant's structuring of his financial affairs for the conceded purpose of placing assets beyond the reach of creditors, present and prospective, is indicative of a proclivity for avoiding responsibility for his just obligations. Moreover, the timing of these transfers suggests substantial concern with the investigation that led to this indictment.

Fourth, it appears, contrary to defendant's implication, that he in fact controls the millions of dollars of assets that nominally are owned by various entities discussed above:

---

[30]
  The Court uses the word "probably" because there perhaps is some possibility that such a statement was made in jest.

[31]
  At least in some circumstances, it probably is correct. In others, it probably is wrong. *See, e.g.,* N.Y. DEBT. & CRED. L. § 276 (McKinney 2001) (conveyance made "with actual intent . . . to hinder . . . either present or future creditors, is fraudulent as to both present and future creditors").

• As noted, the April 15, 2002 court order pursuant to which he transferred ownership of the JPF entities to his children recited that his former wife and his father were to be trustees and co-managers. Nevertheless, Greenberg told IRS agents that he manages these entities.[32] Bank and brokerage statements for at least two JPF accounts still are addressed to the defendant, and defendant's papers state that "Mr. Greenberg transferred all the real estate and Deutsche Bank account . . . JPF VI held at that time, into Laura Adams LLC" in 2004.[33] He claims, moreover, that this was done because "Mr. Greenberg decided to separate his assets and those of his children by creating a separate entity to hold their assets and to be controlled by the children's mother"[34] – this despite the fact that the children's mother and defendant's father, under the terms of the April 15, 2002 order, supposedly were trustees and co-managers already.

• The circumstances concerning the creation of Adams described above strongly suggest that Greenberg controlled that entity at least until his former wife inadvertently learned of its existence and that he does so today.

• Defendant's financial statement[35] treats the assets of the JPF entities and the

---

[32] Def. Mem. Ex. E, at 2.

[33] Def. Mem. 15.

[34] *Id.* 16.

[35] Def. Mem. Ex. N.

Trust as his property.

Fifth, the Court has little confidence that the financial statement submitted by defendant fully discloses his present financial situation. It did not disclose his interest in GG Capital, the liquidity and financial condition of which remain obscure. Moreover, it does not address at all the sources and applications of funds that passed through Greenberg's hands in recent years. The Court therefore is far from persuaded that Greenberg does not control substantial funds above and beyond the assets discussed in this memorandum, funds that could be used to finance his escape and future life.

Against all of this, defendant proposes a bail package consisting of a bond secured by his own property and the posting of properties of other family members.[36] Much of the proposed security is the real estate in the various Greenberg-created entities discussed above, the ultimate source of which is obscure. A relatively modest amount is property of defendant's siblings and his father that appears to have been purchased with funds entirely independent of Greenberg. At least one difficulty with the proposal, however, is that the Court has no way to determine whether forfeiture, even of the entire package, in the event of flight would be a meaningful deterrent. The Court has no information concerning the financial circumstances of the proposed co-signers other than Greenberg's former wife, so it cannot determine whether the loss of the property they propose to pledge would be material to them. Moreover, if Greenberg does have millions of dollars hidden away – and his actions suggest that this is far from impossible – he might well be in a position to make good the losses of his co-signers in the event of forfeiture and live the rest of his life in an

---

[36] Def. Mem. 26-28.

extradition-proof jurisdiction.

*Conclusion*

As the Court is persuaded that Greenberg is a substantial flight risk and that the evidence before it is insufficient to justify a conclusion that the proposed bail package, even combined with other conditions such as home detention, would be sufficient to ensure his appearance, the defendant's motion for bail is denied. It is possible, however, that a fuller showing concerning the financial affairs of the defendant and all of the proposed co-signers could alter this conclusion.[37] Accordingly, the denial is without prejudice to a renewed application.

SO ORDERED.

Dated:          November 15, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[37] Any such showing ideally would include a complete disclosure of defendant's income, assets and expenditures since prior to the commencement of the IRS investigation as well as complete information concerning the financial situations of the proposed co-signers.